**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                    CASE NO. 4:70-cv-01616-MP-GRJ

JEFFERSON COUNTY SCHOOL DISTRICT, et al.,

    Defendants.
_____/

**O R D E R**

This matter is before the Court on Doc. 44, a Joint Motion for Declaration of Unitary Status, filed by the United States and the Jefferson County School District. In January 2012, the United States initiated a review of the Jefferson County School District ("JCSD" or "the District"). Based on a review of the information and data provided by the District and publicly available sources, the United States advised the District that, in its view, the District had fulfilled its affirmative desegregation obligations under the Fourteenth Amendment and applicable federal law, entitling the District to a declaration of unitary status. As indicated by the signatures of counsel at the bottom of Doc. 44, the parties jointly requested that the Court issue an order declaring that the District has achieved unitary status and dismissing this case against JCSD. Upon consideration, the Court will so order.

    **I.**    **PROCEDURAL HISTORY**

On July 9, 1970, the United States initiated this school desegregation suit against the District in the United States District Court for the Northern District of Florida. *See* Doc. 44 at 1. In August of 1970 and 1976, the Court issued two orders that, taken together, essentially (1) enjoined the District from operating racially segregated schools, (2) adopted a desegregation

plan, (3) provided that the Court would retain jurisdiction "until the court finds that the dual system will not be or tend to be reestablished," and (4) required the District to report to the Court on the progress of the District's desegregation. *See* Doc. 44 at 1–2. The Court also placed the case on the inactive docket pending further developments. *Id.* at 2. From then until 2012, little litigation occurred in the case.

On January 5, 2012, the Court removed the case from the inactive docket. *Id.* The United States, at the Court's request, proceeded to investigate whether the District had achieved unitary status, *id.* at 3. Following the conclusion of the investigation, "the United States . . . determined, based on its review of the documents provided by the District and on the information obtained through the site visit and interviews, that, in its view, the District has complied in good faith with this Court's orders." *Id.* On May 23, 2014, with the investigation concluded, the District and the U.S. moved this Court to declare the District unitary, dissolve all injunctions issued against the District in response to the 1970 desegregation action, and dismiss the case with prejudice. *Id.* at 1.

## II. GENERAL LEGAL STANDARD

Courts have long recognized that the goal of the school desegregation process is to promptly convert a *de jure* segregated school system to a system without "white" schools or "black" schools, but just schools. *Green v. Cnty Sch. Bd. of New Kent Cnty, Va.*, 391 U.S. 430, 442 (1968). The standard established by the Supreme Court to determine whether a school district has achieved unitary status, thus warranting termination of judicial supervision, is: (1) whether the school district has fully and satisfactorily complied with the court's desegregation orders for a reasonable period of time; (2) whether the school district has eliminated the vestiges of past *de jure* discrimination to the extent practicable; and (3) whether the school district has

demonstrated a good faith commitment to the whole of the court's order and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *See Missouri v. Jenkins,* 515 U.S. 70, 87–89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491–92, 498 (1992); *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell,* 498 U.S. 237, 248–50 (1991). The Supreme Court has identified six areas, commonly known as "*Green* factors," which must be addressed as part of the determination of whether a school district has fulfilled its duties and eliminated vestiges of the prior dual school system to the extent practicable: (1) student assignment, (2) faculty, (3) staff, (4) transportation, (5) extracurricular activities, and (6) facilities. *Green,* 391 U.S. at 435; *see also Dowell*, 498 U.S. at 250; *Jenkins,* 122 F.3d at 591, n.3. The *Green* factors, however, are not intended to be a "rigid framework." *Freeman*, 503 U.S. at 469. The Supreme Court has allowed courts to consider other indicia, such as "quality of education," in determining whether a district has fulfilled its desegregation obligations. *See id.* at 492-93.

### III.   STIPULATED FACTS AND LEGAL ANALYSIS

In accordance with the above legal standards, the Court will now analyze whether JCSD, under the stipulated facts, has satisfied each of the *Green* factors.

#### A.   Student Assignment

The first factor of the *Green* test directs courts to consider the assignment of students (1) among schools within the school district and (2) among classrooms within each school. *See Singleton v. Jackson Mun. Separate Sch. Dist.*, 419 F.2d 1211, 1216 (5th Cir.1969) (discussing student assignment among schools), *rev'd in part on other grounds*, 396 U.S. 290 (1970);[1]

---

[1] This case was decided prior to the circuit split in October 1981 and is therefore binding on all federal district courts in the Eleventh Circuit. *See* Fifth Circuit Court of Appeals

*Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1261 n.6, 1262–63 (11th Cir. 2007) (discussing student assignment among classrooms) (citing *Ga. NAACP v. Georgia*, 775 F.2d 1403 (11th Cir. 1985)), as *clarified on denial of reh'g*, 521 F.3d 1318 (11th Cir. 2008). With respect to the first aspect, student assignment among schools, courts generally ensure that no schools in the district are racially identifiable. *See Singleton*, 419 F.2d at 1216. More specifically, courts require that formerly segregated school districts strive to allocate students such that "the ratio of [the races in each school is] substantially the same as [the ratio of the races] in the entire school system." *Id.*

However, if "every student in each grade' attends the one school to which his or her grade is assigned," regardless of race, then any differences between schools with respect to their racial makeups are "unquestionably" irrelevant to assessing the success of a desegregation effort because such imbalances merely reflect demographic factors unrelated to segregation. *See U.S. v. Hendry Cnty. Sch. Dist.*, 504 F.2d 550, 551 (5th Cir. 1974); *see also Bell v. W. Point Mun. Separate Sch. Dist.*, 446 F.2d 1362, 1362–63 (5th Cir. 1971) (commenting that a desegregation plan whereby "all the children in a particular grade attend the same school irrespective of the physical location of the student's home within the district" would discharge the school district's duty to attain unitary status).[2] In the instant case, "the District [o]perates single-grade structure schools, such that all students in any grade in the District attend the same school." Doc. 44 at 3. Moreover, "the District . . . . [h]as not constructed or consolidated schools in a manner that

---

Reorganization Act of 1980, Pub. L. No. 96-452 (codified in scattered sections of 28 U.S.C.); *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981)).

[2] These two cases were decided prior to the circuit split in October 1981 and are therefore binding on all federal district courts in the Eleventh Circuit. *See* Fifth Circuit Court of Appeals Reorganization Act of 1980; *Bonner*, 661 F.2d at 1207.

would interfere with its desegregation obligation." Doc. 44 at 3–4. Accordingly, this Court finds the District has met *Green*'s standard for student assignment among schools.

At the classroom level, the student assignment analysis is usually less stringent than at the school level: With respect to student assignment among classrooms, schools are not required to adopt an allocation scheme that guarantees balanced racial ratios. *Holton*, 490 F.3d at 1261–63. In general, the only rule is that classroom assignment decisions not be motivated by discriminatory intent. *Id.* at 1261. For example, schools may allocate students based on ability even if "ability-grouping practices . . . have the *effect* of creating racial imbalances within classrooms," as long as "the assignment method is not based on the present results of past segregation or will remedy such results through better educational opportunities." *See id.* at 1262 (some emphases added) (citations and quotation marks omitted). Courts are very deferential to school districts in determining whether ability-grouping practices meet that standard. *See Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1347 (11th Cir. 2005) (holding that "it is educators, rather than courts, who are in a better position ultimately to resolve the question whether [ability-grouping practices are], on the whole, more beneficial than detrimental to the students involved. Thus, as a general rule, school systems are free to employ ability grouping . . . ." (citations and quotation marks omitted)), *appealed after remand*, *Holton*, 490 F.3d 1257.

In the instant case, "the United States has determined, based on its review of the documents provided by the District and on the information obtained through visits and interviews, that . . . . [the] District data reveals no evidence that classroom assignment decisions improperly consider race," and "the District . . . . [h]as granted and denied student transfers . . . without discriminating on the basis of race." *See* Doc. 44 at 3–5. Moreover, to the extent that the

District assigns students to different classes based on ability, the parties and this Court find no reason to doubt that the practice provides "better educational opportunities" that help "remedy [the] results [of past segregation] through better educational opportunities." *See Holton*, 425 F.3d at 1346-47 (citations and quotation marks omitted). Accordingly, this Court finds the District has met *Green*'s standard for student assignment among classrooms.

    B.    <u>Faculty and Staff</u>

Similar to the discussion above, the "faculty" and "staff" factors of the *Green* test are satisfied when, for each of the two groups, in each school, the ratio of the races is "substantially the same" as it is in the school district as a whole. *Singleton*, 419 F.2d at 1216. Courts have interpreted "substantially the same" somewhat flexibly, tolerating, for faculty and staff, up to a 15% variation between (1) the proportion, in each school, of Caucasian to African American members of the group and (2) the proportion, in the entire school district, of Caucasian to African American members of the group. *See Pitts by Pitts v. Freeman*, 887 F.2d 1438, 1447–48 (11th Cir. 1989), *aff'd in part, rev'd in part on other grounds sub nom.*, *Freeman*, 503 U.S. 467; *Holton*, 425 F.3d at 1334; *Lockett v. Bd. of Educ. of Muscogee Cnty. Sch. Dist., Ga*, 92 F.3d 1092, 1095 (11th Cir. 1996); *see also U.S. v. Montgomery Cnty. Bd. of Educ.*, 395 U.S. 225, 232–33 (1969). In fact, even greater variation might be acceptable because the 15% cap is not a rule; it is merely a statistic that courts have repeatedly found satisfactory. *Pitts by Pits*, 887 F.2d at 1447–48.

In the instant case, "the United States has determined, based on its review of the documents provided by the District and on the information obtained through visits and interviews," that the composition of the District's faculty and staff "complies with the mandate of *Singleton* . . . ." Doc. 44 at 3–4. Specifically, the "'principals, teachers, teacher-aides and

other staff who work directly with children at a school [are] assigned [such] that in no case [does] the racial composition of a staff indicate that a school is intended for Negro students or white students.'" *See id.* 4 (quoting *Singleton*, 419 F.2d at 1217–18). Accordingly, this Court finds the District has met *Green*'s standards for the racial makeup of faculty and staff.

C.   Transportation

*Green* also requires courts to assess whether one race is more burdened than others by the school district's system of transportation to school and extracurricular activities. *See Holton*, 425 F.3d at 1336; *Milliken v. Bradley*, 433 U.S. 267, 288 n.19 (1977) (approvingly describing how the supervising district judge "sought carefully to eliminate burdensome transportation of Negro children"). Actually, however, it is acceptable for one race to be more burdened than others with respect to transportation as long as the bussing situation is caused by "racial imbalances in attendance zones resulting from demographics." *See United States v. State of Ga., Meriwether Cnty.*, 171 F.3d 1333, 1341 (11th Cir. 1999). For example, in *Holton* the school district provided bussing only for extracurricular activities, special education, and a small group of entirely African American elementary school students. *See Holton*, 425 F.3d at 1336. Apparently, the bussing for extracurricular and special education satisfied the *Green* test because the transportation was available to all students, regardless of race. *See id.* Further, although only African American students were bussed, the situation was found to be nondiscriminatory because (1) the route involving those students was implemented to transport students that previously attended one all-black elementary school to another all-black elementary school, *id.*; and (2) the presence of the all-black schools was due to "changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment" rather than intentional

segregation. *Id.* at 1333. In the case at bar, "the United States has determined, based on its review of the documents provided by the District and on the information obtained through visits and interviews," that the District "[p]rovides transportation to students in a non-segregative and non-discriminatory manner." *See* Doc. 44 at 3–4. Accordingly, this Court finds the District has met *Green*'s transportation standard.

### D. Extracurricular Activities

*Green* requires formerly segregated school districts to ensure that "extracurriculars [are] available to all students without regard to race, and that no racial imbalances exist[] within those programs." *See Holton*, 425 F.3d at 1336. In the instant case, "the Parties agree that the District is unitary and has eliminated the vestiges of the former dual school system to the extent practicable," and this Court finds no evidence that the District racially discriminates in the availability or quality of extracurricular activities. *See* Doc. 44 at 6. Accordingly, this Court finds the District has met *Green*'s standard regarding extracurricular activities.

### E. Facilities

*Green* requires formerly segregated school districts to make certain that no "imbalance exists regarding . . . facilities." *See Thomas Cnty. Branch of N.A.A.C.P. v. City of Thomasville Sch. Dist.*, 299 F. Supp. 2d 1340, 1364 (M.D. Ga. 2004), *aff'd in part, rev'd in part on other grounds sub nom.*, *Holton*, 425 F.3d 1325. Courts consider "facilities" synonymous with "school buildings," so they assess this factor by comparing the quality of different, racially identifiable schools within the district in question. *See id.*; *Valley v. Rapides Parish Sch. Bd.*, 646 F.2d 925, 932 (5th Cir. 1981) (using the terms "facilities" and "schools" interchangeably, reporting, for

example, that "[f]our of the *facilities*, South Alexandria Elementary, Lincoln Road Elementary, Peabody Elementary, and Acadian Elementary, one in each cluster, became sixth grade centers . . . ." (emphasis added)), *on reh'g*, 653 F.2d 941 (5th Cir. 1981) (per curiam). However, similar to the case law on student assignment discussed earlier, if "all . . . students attend the same schools regardless of their race, there can certainly be no legitimate claim that any imbalance exists regarding . . . facilities." *Thomas Cnty. Branch of N.A.A.C.P.*, 299 F. Supp. 2d at 1364.

In the instant case, as mentioned above, the District "[o]perates single-grade structure schools, such that all students in any grade in the District attend the same school." Doc. 44 at 3. In addition, "the District . . . . [h]as not constructed or consolidated schools in a manner that would interfere with its desegregation obligation." Doc. 44 at 3–4. Accordingly, this Court finds the District has met *Green*'s facilities standard.

## III. CONCLUSION

Based on the foregoing analysis, this Court finds that the school district has fully and satisfactorily (1) complied with the court's desegregation orders for a reasonable period of time, (2) eliminated the vestiges of past *de jure* discrimination to the extent practicable, and (3) demonstrated a good faith commitment to the whole of the Court's desegregation order and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *See Jenkins*, 515 U.S. at 87–89; *Freeman*, 503 U.S. at 491–92, 498; *Dowell*, 498 U.S. at 248–50. The Court concludes, therefore, that the District has met the legal standards

for a declaration of unitary status, and that it is entitled to dismissal of this action.

Accordingly, it is hereby

**ORDERED AND ADJUDGED**:

The Jefferson County School District is declared unitary, all prior injunctions in this case are dissolved, jurisdiction is terminated, and this case is dismissed with prejudice.

The case remains in place as to Gadsden County School District and Jackson County School District.

**DONE AND ORDERED** this *22nd* day of October, 2014

*s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge